# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JANET E.  DAVIS            )
                                    )
           Plaintiff,        )
                                    )
          v.              )          Civil Action No. 10-61
                                    )
                                    )
SCHOOL DISTRICT OF PITTSBURGH,   )
BOARD OF EDUCATION OF SCHOOL     )
DISTRICT OF PITTSBURGH, MICHAEL  )
GAVLIK, in his individual capacity,     )
                                    )
          Defendants.      )

## MEMORANDUM OPINION

CONTI, District Judge.

In this memorandum opinion the court considers the motion for summary judgment (ECF No. 26) filed by defendants the School District of Pittsburgh (the "District"), the Board of Education of the District (the "Board"), and Michael Gavlik ("Gavlik" and together with the District and the Board, "defendants"), against all claims asserted by plaintiff Janet E.  Davis ("Davis" or "plaintiff").  The complaint (ECF No. 1) contains the following counts: (1) gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq*.; (2) retaliation for complaining about gender discrimination in violation of Title VII; (3) age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.  § 621 *et seq*.; (4) sex discrimination, age discrimination and retaliation in violation of the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT.  § 951 *et seq*.; and (5) deprivation of her civil rights and retaliation, pursuant to 42 U.S.C. § 1983, for alleged violations of her rights under the First and Fourteenth Amendments to the United States Constitution.

After considering the record in this matter and the parties' written submissions, in light of the summary judgment standard and for the reasons set forth below, defendant's motion for summary judgment will be GRANTED in part and DENIED in part.

## Factual and Procedural Background

Davis was employed by the District from September 1970 through her retirement in June 2008 as a health and physical education teacher. (Combined Concise Statement of Material Facts ("CSF") (ECF No. 44) ¶ 21.) She began teaching at Allderdice High School ("Allderdice") in the 1973-1974 school year. (Id. ¶ 22.) She served as the Instructional Teacher Leader of her department for at least the last three years of her employment at Allderdice. (Id.) She was the first head coach of the Allderdice girls' basketball team, and she testified that she had "built" the program. (Id. ¶ 23.) When she retired from her teaching position at Allderdice, plaintiff forfeited her position as the basketball coach. (Id. ¶ 25.)

On March 28, 2008, while still teaching at Allderdice, Davis submitted an Intent to Return to Coaching Assignment form, which was signed by Allderdice Principal Robert Scherrer ("Scherrer"). (Id. ¶ 28; ECF No. 28-2 at 1.) When Davis submitted the Intent to Return to Coaching Assignment form in March 2008, she had not yet decided whether to retire. (CSF (ECF No. 44) ¶ 29.) Davis was not sure whether she considered the possibility of retirement as early as March 2008. (Id. ¶ 30.)

In mid- to late-April 2008, plaintiff and Scherrer exchanged emails and met regarding plaintiff's concerns about staffing at Allderdice for the next school year, as well as the male/female ratio of physical education teachers. (Id. ¶ 60.) Scherrer agreed with plaintiff's concerns regarding the ratio issue. (Id. ¶ 61.) Prior to Davis raising the physical education teacher gender disparity issue, Scherrer had not reviewed the article in the collective bargaining agreement ("CBA") which dealt with gender ratios, and had not believed that it was an issue at

Allderdice.  (Id. ¶ 62.)  Following retirements and the cutting of two positions, Scherrer did not interview physical education teachers to be placed at Allderdice; a person in the human resources department ("HR") informed him who would be working at Allderdice in the upcoming school year.  (Id. ¶ 64.)  As a result, a male physical education teacher who taught at Allderdice during the 2007-2008 school year remained as a teacher for the next school year, and no other candidates were interviewed.  (Id. ¶¶ 64-65.)

At the Board's May 21, 2008 meeting, it approved plaintiff's coaching assignment, along with more than 350 other coaching assignments.  (Id. ¶ 33.)

Plaintiff retired from teaching in June 2008 because, under the new CBA, health care benefit costs to be paid by retirees would increase from 25% of additional costs to 50% and the $800 payment toward Medicare Plus would not be paid to her.  (Id. ¶ 27.)  On or about June 2, 2008, Davis advised Scherrer and Marlene Harris ("Harris"), an HR representative, that she planned to retire at the end of the school year.[1]  (Id. ¶¶ 35, 148.)  When Davis told Scherrer she intended to retire from teaching, Davis informed him that she would like to continue to coach.  (Id. ¶ 150.)  Davis testified that Scherrer was happy that Davis could continue to coach.  (Id.)  Scherrer testified that he did not, at that time, understand the implications of the CBA to Davis's continued employment as a basketball coach at Allderdice.  (Trans. Dep. Robert Scherrer

_____

[1] Davis sent an email to Harris, copied to Scherrer, in which she wrote:

> I met with my principal, Robert Scherrer, and informed him that I have decided to retire.  I have not scheduled a meeting with the Board's retirement office yet.  I will do that.  Mr. Scherrer suggested I give you a heads up though because of the next postings.  We will need a **female** physical education/health teacher as we have separate male and female classes.  Our past practice and Article 30 (1c) of our contract supports this.  Next year we will have 7 teachers – 4 male and 3 female.

(ECF No. 28-2 at 17 (emphasis original).)

("Scherrer Dep.") (ECF No. 41-4) at 2.)[2]  When a teacher retired, her coaching position was deemed vacant and was required to be posted, according to Michael Gavlik, the athletic director at the District.  (Trans. Dep. Michael Gavlik ("Gavlik Dep.") (ECF No. 41-5) at 4, 6.)  The District's policy is that once a teacher retires, his or her coaching position is rescinded.  (CSF (ECF No. 44) ¶ 151.)  Article 42 of the CBA requires that active and qualified teachers be preferred for a coaching vacancy; paraprofessionals, substitute or retired teachers, and other District employees are viewed as external candidates.  (Id. ¶ 86.)  There are no specific rules or policies relating to when a coaching vacancy must be posted.  (Id. ¶ 82.)  According to Gavlik:

> [T]here's no direct instructions in that regards.  During the course of a school year if a position is resigned, which is, basically, the typical scenario . . . we try to post it immediately.  If requested by a principal to wait and there's a good reason to do so, if it's something where someone's resigned during the season and they're waiting to actually officially remove themselves from the position after the end of that . . . season, then maybe we would wait at that point.

(Gavlik Dep. (ECF No. 37-7) at 9.)  Gavlik testified that if the District became aware of openings in June (as was the case when Davis retired),

> what we try to do is we address the fall positions first because they would be the seasons coming up the fastest.  So if we have to, we would apply over the summer.  Not very successful a lot of times, but if they are a winter position, we may wait till the school year starts so that teachers are back in their buildings, so they might see the postings more readily than they would possibly in the summer.

(Id. at 10.)  When a coaching vacancy arises during the summer, the District will sometimes post the vacancy after school begins so that more candidates will see and apply for the position.  (Id.)

Scherrer testified a retiring teacher could still apply for the newly-vacant coaching position created by effect of her retirement, but that under the CBA current District employees had a right to the coaching position before it would be given to a retired employee.  (Scherrer Dep. (ECF No. 41-4) at 2.)  Scherrer explained that plaintiff's retirement occurred at the end of

---

[2] The parties filed the deposition exhibits to this motion for summary judgment in piecemeal fashion, with incomplete portions in various places on the docket.  For that reason, the citations in this opinion to the electronic docket may reference multiple docket numbers.

his first year with the District and that he had had no occasion to review or consider the seniority and preference provisions of the CBA before that time.  (Id. at 11.)

It was within Scherrer's discretion to post Davis's coaching position during the summer months since as a principal he works year round.  (Id. ¶ 152.)  When Davis informed him about her retirement on June 2, 2008, Scherrer did not immediately request that the Allderdice girl's head basketball coach position be posted because (1) the Board had not yet approved her retirement, (2) basketball is a winter sport, and (3) he had other administrative priorities in the summer relating to the beginning of the school year.  (Id. ¶ 44.)  Scherrer admitted that there was no rule or regulation that prevented him from posting the vacancy of the Allderdice girl's head basketball coach position prior to the start of the new school year, and the only step he had to take to do so was to contact HR who would then post the position.  (Scherrer Dep. (ECF No. 37-4) at 5.)  It is the responsibility of the school's principal or the athletic department to inform HR that a coaching position is vacant and needs to be posted.  (CSF (ECF No. 44) ¶ 80.)  Upon receiving information that a position is vacant, personnel in HR post the vacancy and fill in the details on the job posting.  (Id. ¶ 81.)  HR was aware of the vacancy as of June 2, 2008, because Davis emailed Harris at Scherrer's suggestion.

On June 16, 2008, Davis prepared a letter specifically addressed to Board members and some managerial employees at the District in connection with her concerns about maintaining a balance of male and female physical education teachers.  (Id. ¶ 154; ECF No. 37-4 at 33.)  In this letter Davis complained that gender discrimination was occurring within Allderdice and another school and requested that the Board take some action.  (Id.)  Davis followed up her complaint with emails to the same Board members on July 8, 2008.  (Id. ¶ 155.)  In one email, Davis writes

> I had hoped that your integral involvement with the negotiations committee would afford you an excellent understanding of my concern in this Allderdice matter. The PFT and the personnel office have created a discriminatory situation by staffing 5 male/2 female physical education teachers at Allderdice. . . . Please take

a look at this matter so that the PFT and the BOE do not violate our contract. Thank you for your time.

(ECF No. 37-9 at 7.)

On June 25, 2008, the Board approved fifty-seven retirements, including plaintiff's retirement. (Id. ¶ 36.) At the Board's September 24, 2008 meeting, it rescinded plaintiff's coaching position as the Allderdice head girls' basketball coach, as well as several other coaching positions. (Id. ¶ 37.) Davis first heard that her position had been rescinded the next day when she obtained the minutes for the September 24, 2008 meeting. (Id. ¶ 38.) Plaintiff made a regular practice of obtaining the minutes of the Board meetings in order to keep herself informed about the business conducted by the Board. (Id. ¶ 31.) After the rescission, plaintiff continued using the gym for conditioning and held a "fall league" on Sundays. (Id. ¶ 40.) Plaintiff testified that no one questioned her use of the gym because she "was viewed as the coach." (Id. ¶ 41; Trans. Dep. Janet E. Davis ("Plaintiff's Dep.") (ECF No. 41-3) at 15.) The girls' basketball season at Allderdice usually begins in mid-November. (CSF (ECF No. 44) ¶ 43.) Davis testified that coaches are involved in many activities outside the dates of the official season, which include intramurals, conditioning, and spring and fall leagues. (Plaintiff's Dep. (ECF No. 41-3) at 3.)

Scherrer testified that there are "no official responsibilities" for a basketball coach outside of the official season, but that "in many cases, coaches do conditioning and things throughout the year." (Scherrer Dep. (ECF No. 41-3) at 3.) He had been aware plaintiff had been performing some functions of the girls' basketball coach into September and October 2008. (Id. at 4.) In early September 2008, Scherrer signed and approved several applications filed by Davis for use of the Allderdice gym for conditioning. (Id.; Scherrer Dep. Ex. 3 (ECF No. 37-4) at 21-25). Scherrer approved Davis's use of the gym for "conditioning," "basketball

conditioning," "games (exhibition)," and "pre-season conditioning" on at least twenty-eight dates from September 2008 through January 2009. (Scherrer Dep. Ex. 3 (ECF No. 37-4) at 21-25.)

Gavlik testified that while Davis was conducting these training sessions, an anonymous complaint was received from a parent who asked why a retired basketball coach was running official basketball practices. (Id. ¶ 104.) Gavlik emailed Scherrer on September 5, 2008, as a result of the complaint, noting that the position needed to be posted. (Id.)

Gavlik directed someone at HR to post the Allderdice girls' basketball head coach position after learning that Davis had retired and was still holding practices in September 2008. (Id. ¶ 106; Gavlik Dep. (ECF No. 41-5) at 4.) The "Girls Head Basketball Coach – Allderdice" posting was dated September 9, 2008, with a closing date of September 15, 2008. (CSF (ECF No. 44) ¶ 107.) Either Scherrer or the athletic director at Allderdice contacted Davis and informed her that Gavlik directed HR personnel to post her coaching position and that Scherrer wanted to make her aware of the posting so that she could apply for the position. (Id. ¶ 163.) Plaintiff interviewed on October 10, 2008. Both David Walchesky ("Walchesky") and another individual interviewed on October 14, 2008. (Id. ¶ 108.) Walchesky had been a teacher with the district since August 1981, and had been assigned to Allderdice as a teacher since the 2007-2008 school year. (Id. ¶ 109.) Walchesky had twenty-five years of coaching experience with the District in multiple sports and as assistant and head coach in girls' basketball and softball. (Id. ¶ 110.)

Gavlik emailed Scherrer on October 20, 2008, regarding telephone calls he received from unhappy parents who indicated that Scherrer had told them that he could not select Davis as the head coach even though she was the most qualified. (Id. ¶ 111.) In response to Gavlik's October 20, 2008 email, Scherrer called Gavlik and advised him that he was aware that although he felt plaintiff was the most qualified, she could not be rehired as the coach because of the CBA. (Id. ¶ 112.) On the form submitted to HR, Scherrer and Allderdice's athletic director, who had

conducted the interviews together, indicated that Davis was their first choice to fill the coaching vacancy, but indicated that she was no longer a District employee. (ECF No. 28-9 at 24.) Although Scherrer and Cornell selected Davis for the coaching position at Allderdice, HR did not accept the recommendation to hire plaintiff over Walchesky. (Id. ¶ 173.) Walchesky received an email dated October 21, 2008 from Kim Sterling ("Sterling"), who worked in HR and was responsible for posting coaching vacancies; in the email, Sterling offered him the coaching position, which he accepted. (Id. ¶ 114.)

Davis never spoke with Scherrer about the timing of the posting for her coaching position after her retirement from teaching. (Id. ¶ 91.) She did not believe that it was wrong that her coaching position was posted as vacant, but that it was wrong that she was treated differently than others in a similar situation. (Id. ¶ 92.)

Other teachers in the District who retired around the same time as Davis attempted to retain their coaching positions. According to the testimony of Sherry Hazuda ("Hazuda"), who became a member of the Board in 2008 (id. ¶ 16), Ronald Wabby ("Wabby") wanted to remain as the football coach at Brashear High School (which is in the District), but was not permitted to do so because he had retired. (Id. ¶ 89.) In fact, Wabby retired from his coaching position. Wabby wrote a letter to Gavlik on December 17, 2007, informing Gavlik of his retirement from coaching:

> As of 1/8/08, I will not return as the head football coach at Brashear. I am not retiring for health reasons or because I am burned out, I am retiring from football because I am retiring from teaching. The Pittsburgh Board of Education and the Pittsburgh Federation of Teachers feel that once you retire from teaching that you are no longer a union member and can not keep your coaching position, unless no one else in the school district wants the position. If the program is like Brashear's, people are just waiting to take the job, because of the success of the program. If the Board and Union, continue to let coaches, who still have experience and the desire to coach go, we will fall farther behind the WPIAL.

(ECF No. 28-15 at 2.)

At least one retired teacher, James Kahn ("Kahn"), was given a coaching position over a qualified teacher in the District. (CSF (ECF No. 44) ¶ 101.) Kahn retired in June 2008 from Peabody High School, where he had served as boys' volleyball and boys' basketball coach. (Trans. Dep. James Kahn ("Kahn Dep.") (ECF No. 37-10) at 1-2.) Like Davis, Kahn had signed intent to return forms in the spring of 2008 (CSF (ECF No. 44) ¶ 119), but had not made a decision regarding his retirement at the time he signed the intent to return forms. (Id. ¶ 120.) The principal at Peabody High School learned about Kahn's retirement in June 2008 and asked Gavlik to post the coaching position. (Id. ¶ 121.) The position was posted online sometime during the summer.[3] (Id. ¶¶ 123, 124.) Among the other applicants for Kahn's coaching position were at least two then-current employees of the District. (Trans. Dep. Melissa Friez ("Friez Dep.") (ECF No. 37-5) at 3, 5.) One of those employees was Shane Rubbe ("Rubbe"), who had worked for the District since 1996 as a physical education teacher and had held various coaching positions. (CSF (ECF No. 44) ¶ 124.)

Melissa Friez ("Friez"), the principal at Peabody High School, testified that Rubbe was not selected because he worked at a different school in the District, and because she felt it would detract from his primary responsibility of teaching for him to be required to leave work early at his teaching school. (Friez Dep. (ECF No. 37-5) at 5-6.) Friez also said she had concerns about Rubbe's ability to deal with students who are "as difficult as Peabody students could be." (Id.) Rubbe testified that for away games, he would have needed to leave his home school at 2:15 p.m., which would have required the principal to provide coverage. (CSF (ECF No. 44) ¶ 127.)

---

[3] Davis believes that she was treated differently than Kahn since his job vacancy was posted in the summer where it was less likely to be seen whereas her job vacancy was not posted until everyone had returned back from summer break, would be viewed by more people, and would therefore have more applicants. (Plaintiff's Dep. (ECF No 37-1) at 20.) Susan Sinicki, who has worked at the District since 2001 and has been involved in personnel work since 2004 at the latest, testified that other than Kahn, no other retired teacher had been given a coaching position over a current qualified teacher. (CSF (ECF No. 44) ¶¶ 19, 101.)

His principal had permitted him to leave early to go to his previous coaching position at a different school and they had discussed that he would also be permitted to make adjustments to his schedule if he received the Peabody coaching position. (Id. ¶ 129.) Friez ultimately selected Kahn as her first recommendation to be the Peabody boys' head basketball coach. (Id. ¶ 130.) The Board approved Kahn's new appointment to the Peabody boys' head basketball coach position at its meeting held on November 25, 2008. (Id. ¶ 131.) Under Article 42 of the CBA, Rubbe should have been offered the Peabody coaching position. (Id. ¶ 134.)

After learning in mid-November 2008 that Kahn was selected for the Peabody boys' head basketball coach position, Rubbe filed a union grievance. (Id. ¶ 132.) An agreement was reached between and among the District, the teachers' union, and Rubbe. (Id. ¶ 133.) Because the basketball season had already started with Kahn as the coach and in lieu of filing a grievance, Rubbe and the District reached an agreement whereby the District would post the Peabody boys' head basketball coach position again the following year. (Id. ¶ 133.)

During Davis's thirty-year tenure with the district, she filed a lawsuit against the district in 2001, which settled in 2003, filed a grievance regarding summer school pay in 2007, complained at a Board meeting about the elimination of the swim matrons[4] in April 2008, and complained about the gender ratios for physical education teachers for the school year that would follow her retirement. (Id. ¶ 143.) Plaintiff alleged gender discrimination and retaliation in her 2001 lawsuit. (Id.) Her complaints in 2008 about the staffing of physical education teachers at Allderdice included her interpretation of the CBA and gender balance in the work force at the District. (Id.)

---

[4] Based upon the letter Davis submitted to members of the Board when she spoke at their meeting regarding the swim matrons, it appears that they were a group of women who assisted the physical education programs at schools in the District in a variety of functions, predominantly by overseeing the school pools. (ECF No. 28-2 at 6.) The letter suggests their jobs were eliminated for budgetary reasons. (Id.)

Plaintiff filed charges of discrimination with the Equal Employment Opportunity

Commission ("EEOC") on February 9, 2009.  (Compl. (ECF No. 1) ¶ 14.)  She cross-filed with

the Pennsylvania Human Relations Commission.  (Id.)  The EEOC issued a notice of dismissal

and right-to-sue letter dated October 22, 2009.  (Id.)  Plaintiff filed the complaint in the instant

action on January 14, 2010, within ninety days of the date on which the notice of dismissal and

right-to-sue letter was issued.  (Id.)

## Standard of Review

Federal Rule of Civil Procedure 56 provides in relevant part:

**(a) Motion for Summary Judgment or Partial Summary Judgment.**

> A party may move for summary judgment, identifying each claim or
> defense — or the part of each claim or defense — on which summary
> judgment is sought.  The court shall grant summary judgment if the
> movant shows that there is no genuine dispute as to any material fact and
> the movant is entitled to judgment as a matter of law.  The  court should
> state on the record the reasons for granting or denying the motion.
>
> . . . .

**(c) Procedures.**

> **(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be
> or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including
> > depositions, documents, electronically stored information,
> > affidavits or  declarations, stipulations (including those made for
> > purposes of the motion only), admissions, interrogatory answers,
> > or other materials; or
> >
> > **(B)** showing that the materials cited do not establish the absence or
> > presence of a genuine dispute, or that an adverse party cannot
> > produce admissible evidence to support the fact.

FED. R. CIV. P. 56.

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the burden of proof
> at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) (citing Anderson, 477 U.S. at 248–52); Celotex Corp., 477 U.S. at 322–26 ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."). The Supreme Court held in Celotex Corp. that:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

Celotex Corp., 477 U.S. at 324 (emphasis added). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). The United States Supreme Court later emphasized:

> [W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Woodside v. Sch. Dist. of Philadelphia Bd. of Educ., 248 F.3d

129, 130 (3d Cir. 2001); <u>Doe v. Cnty. of Ctr.</u>, 242 F.3d 437, 446 (3d Cir. 2001); <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

### Discussion

Plaintiff's complaint contains the following counts: (1) sexual (gender) discrimination in violation of Title VII in that she was treated less favorably than similarly situated male employees (count I); (2) retaliation for actions protected by Title VII (count II); (3) age discrimination in violation of the ADEA (count III); (4) sex and age discrimination and retaliation in violation of the PHRA (count IV); (5) First and Fourteenth Amendment violations and retaliation pursuant to 42 U.S.C. §1983 (count V). In her brief in opposition to summary judgment, plaintiff withdrew her age discrimination claims and consented to the withdrawal of count III. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. ("Pl. Br.") (ECF No. 34) at 1, n.1.)

Because claims arising under the PHRA are governed by the same standards set forth in Title VII for determining summary judgment motions, <u>see</u> <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 409 (3d Cir. 1999), the court will not separately consider or analyze any of plaintiff's state law claims in this memorandum opinion; rather, the court will consider all determinations and rulings regarding each federal claim to be conclusive with respect to its analogous state cause of action.

Defendants argue that they are entitled to summary judgment with respect to all of plaintiff's claims. With respect to the gender discrimination claims under Title VII and the PHRA in counts I and IV, defendants argue that plaintiff failed to set forth facts sufficient to establish a prima facie case, and that she could not refute the proffered, legitimate, nondiscriminatory reason for not hiring her—the CBA. (Defs.' Br. (ECF No. 29), at 2-.)

With respect to the retaliation claims in counts II and IV, defendants argue that plaintiff failed to exhaust her administrative remedies on these issues as they had no apparent relationship with the identified protected activities (see Defs.' Br. (ECF No. 29) at 7-8) and were not "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996). Defendants argue that the only protected activity alleged by plaintiff is her 2001 lawsuit, and that no reasonable jury could find a causal relationship between the 2001 lawsuit and the failure to hire her in 2008. (Defs.' Br. (ECF No. 29) at 8-11.)

With respect to the equal protection claim raised in count V, defendants claim that plaintiff failed to prove that she was subject to "purposeful discrimination" because of her sex. (Id. at 14 (citing Keenan v. City of Phila., 983 F.2d 459, 465 (3d Cir. 1992).) They argue that Gavlik must be dismissed from the § 1983 claim because there is no evidence that he personally participated in the alleged wrongdoing. (Id. at 15.)

With respect to the freedom of speech claim raised in count V, defendants claim that plaintiff failed to show that her "'conduct was constitutionally protected'" and that the "protected activity was a substantial and motivating factor in the alleged retaliatory action." (Id. at 16 (quoting Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002)) (citing Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 793 (3d Cir. 2000)).)

### I. Gender Discrimination Claims under Title VII and the PHRA (Counts I and IV)

In cases where a plaintiff lacks direct evidence of discrimination, the Court of Appeals for the Third Circuit has applied the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). A plaintiff must first establish a prima facie case of discrimination. Id. at 802. If a plaintiff proves a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the

14

adverse employment decision.  Simpson v. Kay Jewelers Div. of Sterling, Inc., 143 F.3d 639, 644 n.5 (3d Cir. 1998).  The defendant may satisfy its burden by offering evidence of a nondiscriminatory reason for its action.  Fuentes v. Perksie, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendant offers a legitimate reason for the conduct in question, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999). The plaintiff can satisfy this burden by setting forth evidence from which a fact-finder could reasonably either (1) disbelieve the defendant's articulated nondiscriminatory reasons or (2) believe that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764.  A "determinative factor" means that "she would not have been terminated but for" the existence of a discriminatory reason.  See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 n.8 (3d Cir. 2007).  A plaintiff must show that "he was the victim of intentional discrimination by showing that the proffered explanation is unworthy of credence."  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

    In order to establish a prima facie case of sex discrimination a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) the circumstances surrounding her adverse employment action give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated differently.  Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 409 (E.D. Pa. 2000) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999)).  A reasonable jury could certainly infer from the extreme similarities between Davis's situation and Kahn's situation, as well as the vastly different ways in which the coach-hiring processes were carried out, that she was treated differently because of

her gender, establishing a prima facie gender discrimination claim for the purposes of this summary judgment motion.

Defendants proffered that the reason for discharging plaintiff was to comply with the CBA. Compliance with the CBA is a legitimate, nondiscriminatory reason. <u>See, e.g.</u>, <u>Johnson v. Keebler-Sunshine Biscuits, Inc.</u>, 214 F. App'x 239, 242-243 (3d Cir. 2007). Therefore, plaintiff must show "weaknesses, implausibilities, inconsistencies or contradictions" in defendants' proffered reasons, so the fact-finder may find it unworthy of credence. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994).

Plaintiff adduced evidence that a male counterpart, Kahn, who retired at the same time as Davis, was given substantially different treatment than Davis, indicating the Board did not always follow the preference rules set forth in the CBA. Such evidence substantially weakens defendants' contention that not hiring Davis was *required* by the CBA. Kahn was a high school boys' basketball coach who, just like Davis, presented his intent to retire in June 2008. Kahn's coaching position was posted in the summer of 2008, but Davis's was not posted until after the new school year started. Both Davis and Kahn were selected as the first choice for their just-vacated coaching positions by their school administrators, but only Kahn was allowed to continue coaching. A reasonable jury could credit plaintiff's testimony that Kahn's position was intentionally posted in the summer when significantly fewer people would see it and apply while Davis's position was posted in September 2008, when staff would have returned to work and the posting would have been more readily available to them. Kahn's appointment to the basketball coach position was approved by HR and the Board—even though there were internal qualified teaching candidates who applied for the position. Defendants allowed Kahn to coach in violation of the CBA, at precisely the time that they are proffering the CBA prevented them from allowing Davis to coach. A jury could reasonably disbelieve the proffered explanation on the ground that it is contradicted by defendants' own actions in hiring Kahn.

Defendants argue that "Plaintiff 'cannot selectively choose a comparator.'" (Defs.' Br. (ECF No. 29) at 4 (citing <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 646 (3d Cir. 1998).) In <u>Simpson</u>, the Court of Appeals for the Third Circuit held that the Title VII plaintiff in that case could not show that the defendant's nondiscriminatory reasons for the adverse employment actions were pretext by picking out "one comparator who was not demoted amid a sea of persons treated the same as her." <u>Simpson</u>, 142 F.3d at 646. The plaintiff in <u>Simpson</u> chose one comparator who was treated more favorably than her and ignored *thirty-five* others who were demoted in a similar fashion to her. <u>Id.</u> at 646-47. Davis in this case, however, presented evidence that among the three[5] coaches who were retiring from teaching in the summer of 2008, one female coach (plaintiff) was not rehired for her coaching position, one male coach (Kahn) was rehired for his job, and a second male coach (Wabby) chose not to attempt to keep his job based on the assumption that he would be prevented from doing so by the CBA, and by an abundance of preferred candidates interested in the job.

Because the number of potential comparators is small, plaintiff's reliance on just one comparator is not flawed. See <u>McClain v. Commonwealth of Pa., Dep't of Corr.</u>, Civil Action No. 09-1641, 2011 WL 2670204, at *8 n.7 (W.D. Pa. July 7, 2011). For that reason, and based on the inconsistencies and contradictions in defendants' proffered reasons, a reasonable jury could choose either to disbelieve the proffered explanation as not supported by the facts, or could choose to believe based on the apparent disparate treatment between Davis and Kahn that Davis's gender was a determinative factor in the decision not to hire Davis. Because a reasonable jury could conclude that plaintiff was discriminated against on the basis of her gender, the court must deny the motion for summary judgment with respect to the gender discrimination claims.

---

[5] To the extent there were other coaches at the District who resigned from teaching positions during the summer of 2008, neither party directed the court towards relevant information in the record.

## II. Retaliation Claims under Title VII (Counts II and IV)

In order to state a claim for retaliation under Title VII, a plaintiff must allege sufficient facts showing "that (1) she engaged in protected activity under Title VII; (2) the employer took an adverse action against her; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action." Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 320 (3d Cir. 2008).

Defendants do not dispute that the failure to hire qualifies as an adverse employment action. They instead argue that the only instances of protected activity that plaintiff could prove were not causally related to the adverse employment action. Thus, the issue before the court is whether there is sufficient evidence of causation in the record. Causation can be shown through temporal proximity between the protected activity and the adverse employment action; an intervening pattern of antagonism; or the evidence taken as a whole. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280–81 (3d Cir.2000); Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir.1997). Davis did not present sufficient evidence to support a causal connection between her arguably protected activities and the adverse employment action on any of these three theories. Because there is insufficient evidence of causation, the court need not determine which of plaintiff's arguably protected activities is actually protected by Title VII.

With respect to the temporal proximity between the protected activity and the adverse employment action, Davis's last arguably protected activity was a set of emails sent on July 8, 2008. The decision not to hire Davis was made in mid-October 2008, more than three months later, which does not suggest that it was related to her July 2008 emails (or any of the other allegedly protected activities occurring before then). See Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (holding two months between protected activity under the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.*, and the adverse employment

18

action was not unduly suggestive); <u>Bartos v. MHM Corr. Servs., Inc.</u>, No. 11-1936, 2011 WL 6065012, at *4 (3d Cir. Dec. 7, 2011) (citing <u>Williams</u> in the Title VII retaliation and gender-discrimination context). In borderline cases, the court may consider "timing plus other evidence." <u>Thomas v. Town of Hammonton</u>, 351 F.3d 08, 114 (3d Cir. 2003). Here, as discussed above there is no other evidence that defendants failed to hire Davis *because* of her protected activities. <u>See</u> <u>Williams</u>, 380 F.3d at 760. The proximity of three-and-one-half months between the last protected activity and an adverse employment action does not unduly suggest retaliation.

The court was not presented with any evidence involving a pattern of antagonism regarding Davis's Title VII protected activities. <u>Cf.</u> <u>Robinson v. Se. Pa. Transp. Auth.</u>, 982 F.2d 892, 895 (3d Cir. 1993) (finding a pattern of antagonism where the plaintiff was subjected to a "constant barrage of written and verbal warnings . . . , inaccurate point totalings, and disciplinary action, all of which occurred soon after [the] plaintiff's initial complaints and continued until his discharge" (internal quotation marks omitted)). To that end, her most recent arguably-protected activity, the emails sent on July 8, 2008, were received with a friendly response that the concerns were passed on to the appropriate individuals to be checked out. (ECF No. 37-9 at 7.) To this response, Davis replied, "Thank you for responding." (<u>Id.</u>) The record reflects Davis had a long history of raising gender-related concerns with the powers-that-be in the District, and the court was not presented with any evidence of antagonistic behavior on the part of representatives of the District in response to any of Davis's complaints. No reasonable jury could conclude, based on the undisputed evidence presented to the court, that there was a *pattern* of antagonism regarding plaintiff's Title VII activities. The only arguably antagonistic reaction would be the decision not to hire plaintiff, and one event does not a pattern make. For the same reasons, the evidence taken as a whole does not reflect a causal connection between any Title VII protected activities and the decision not to hire plaintiff.

Because the court was presented with insufficient evidence to show a causal connection as required to support a Title VII retaliation claim, the court will grant the motion for summary judgment with respect to the Title VII retaliation claims (and analogous state claims). Plaintiff failed to proffer sufficient evidence to establish a causal connection—the only evidence was the not unduly suggestive temporal relationship. Based upon the record before the court, no reasonable jury could conclude that there was a causal link between the July 2008 email and the failure to hire Davis in October 2008. Id. at 761.

### III. Section 1983 – Fourteenth Amendment Equal Protection Claim (Count V)

In order to prevail on a § 1983 claim for violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must prove that she was subject to "purposeful discrimination" because of her sex. Keenan v. City of Phila., 983 F.2d 459, 465 (3d Cir. 1992) (citing Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d Cir. 1990)). To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against him because of his membership in a protected class. See Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 196 (3d Cir. 2009).

"The showing required to prove a § 1983 gender discrimination claim is identical to that required by Title VII." Wood v. Univ. of Pittsburgh, 395 F. App'x 810, 816 (3d Cir. 2010) (citing Stewart v. Rutgers, 120 F.3d 426, 432 (3d Cir. 1997)); accord Wright v. Rolette Cnty., 417 F.3d 879, 884 (8th Cir. 2005) (repudiating the defendant's argument that there are different standards for Title VII and § 1983 gender discrimination claims and holding that "sexual harassment claims under section 1983 are analyzed under the same standards developed in Title VII litigation and the elements of a prima facie case are the same regardless of which statute the plaintiff uses to seek relief"); Cross v. Alabama, 49 F.3d 1490, 1508 (11th Cir. 1995) ("When section 1983 is used as a parallel remedy for violation of section 703 of Title VII . . . the

elements of the two causes of action are the same." (internal quotation omitted)); <u>Beardsley v.</u> <u>Webb</u>, 30 F.3d 524, 529 (4th Cir. 1994) ("Courts may apply the standards developed in Title VII litigation to similar litigation under § 1983."). In resolving a motion for summary judgment, the burden-shifting, <u>McDonnel Douglas</u> test is applicable to these claims. <u>Stewart</u>, 120 F.3d at 432. Here, plaintiff alleges that she was treated differently on account of her gender. Women are a protected class. <u>See</u> <u>Miller v. Beneficial Mgmt. Corp.</u>, 977 F.2d 834, 847 (3d Cir. 1992). Plaintiff alleges that because of her membership in the protected class, she was treated less favorably than Kahn, who is not a member of the class, and was thereby deprived of her constitutional right to equal protection of the law.

For the same reasons stated above with respect to the Title VII gender discrimination claims, the § 1983 gender discrimination claims under the Equal Protection Clause will not be dismissed. The motion for summary judgment must be denied with respect to the § 1983 gender discrimination claims because a reasonable jury could believe that defendants' proffered nondiscriminatory explanation for their disparate treatment of Davis and Kahn is merely pretext for discrimination.

Defendants argue that Gavlik must be dismissed from this claim because he was not directly involved in the alleged wrongdoing. An individual defendant under § 1983 must have "personal involvement in the alleged wrongdoing," and "liability cannot be predicated solely on the operation of respondeat superior." <u>Evancho v. Fisher</u>, 423 F.3d 347, 353 (3d Cir. 2005). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." <u>Id.</u> (quoting <u>Rode V. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988)). Here, plaintiff adduced sufficient evidence showing Gavlik's involvement. Accepting all the facts in the light most favorable to the nonmoving party, Gavlik participated in the process whereby plaintiff's job opening was not posted until the school year began. He ordered Scherrer to post Davis's job opening in September 2008. Gavlik chose to ignore Davis's protest when

she pointed out that Kahn was being permitted to keep his job over a qualified internal candidate—he instead told Scherrer that no internal candidates had been interviewed. (Scherrer Dep. (ECF No. 37-4) at 15.) Because a reasonable jury, viewing the evidence in the light most favorable to Davis, could find that Gavlik was personally involved in the decision not to hire Davis, summary judgment in his favor would be inappropriate.

### IV. Section 1983 – First Amendment Claim (Count V)

Plaintiff alleged a First Amendment retaliation claim under § 1983, claiming that she was not hired for the coaching position in October 2008 because she exercised her First Amendment right to freedom of speech in criticizing the Board and the District on a number of occasions for their handling of gender disparity issues. A plaintiff alleging a First Amendment retaliation claim "must show (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean v. DeFlaminis, 480 F.3d 259, 268 (3d Cir.2007). Prior to the failure to hire Davis in October 2008, the last arguable activity protected by the First Amendment occurred on July 8, 2008, when she sent emails alerting members of the Board to potentially discriminatory gender disparities in staffing within the District. For the same reasons stated above, regarding Title VII retaliation, defendants are correct that no reasonable jury could find a causal link between the protected activity and the failure to hire her. Defendants are entitled to summary judgment on the First Amendment retaliation claim. The alleged retaliation in October 2008 is not close enough temporally to the allegedly protected activity, which last occurred in July 2008, to be unduly suggestive of retaliation. There is no other evidence of retaliation in the

record to bolster the causation determination. The court must enter summary judgment in favor of defendants on the First Amendment claim.

## Conclusion

For the reasons stated above, the court will GRANT in part and DENY in part defendants' motion for summary judgment (ECF No. 26). An appropriate order will follow.

Date: March 20, 2012                                    By the court,

                                                         /s/ Joy Flowers Conti
                                                        Joy Flowers Conti
                                                        United States District Judge